Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, CHRISTOPHER RHINESMITH

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTOPHER RHINESMITH, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br>v.<br><br>VOX MEDIA GROUP, LLC, a Delaware Limited Liability Company,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

Plaintiff CHRISTOPHER RHINESMITH ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant VOX MEDIA GROUP, LLC, a Delaware limited liability company ("Defendant" or "Vox Media"), individually and as successor in interest to Vox Media, LLC. Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.vox.com (the "Website"), a website that Defendant provides for public access and use.

2. Plaintiff personally used the Website during the class period, including on April 28, 2026, and preserved an HTTP archive file, commonly known as a HAR file, of one of his own browsing sessions. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends and the headers and parameters those requests carry.

3. Plaintiff's HAR file accordingly records the requests his browser transmitted to the Third Parties during that session, including the named parameters carrying the contents of his communications and the persistent identifiers transmitted with them. The figures reproduced below are from an independent technical investigation counsel commissioned, which replicated the URLs and user flows recorded in the HAR file, and are included as corroboration.

4. During his use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications and reveal his personal searches and content interests.

5. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing, the referring URLs reflecting the searches he had run and the pages he had

come from, and the article headlines identifying the subject matter he was reading, by causing each such communication to be duplicated and routed to the Third Parties over a separate channel while the same content was still being transmitted between his browser and servers operating under Defendant's control.

6. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

7. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). The Website has been configured in this manner from prior to the beginning of the class period in this case and continuously through to today and ongoingly, both while the Website was operated by Vox Media, LLC and since Defendant acquired it.

## II. GENERAL ALLEGATIONS

8. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

9. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

10. When users visit the Website, Defendant causes tracking technologies to be

embedded in visitors' browsers. These include, but are not limited to, the following:

- The Comscore Tracker
- The TikTok Tracker
- The Permutive Tracker
- The Google Tracker
- The Parse.ly Tracker

11. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

12. The Trackers are operated by distinct third parties, including Comscore, Inc. (as to the Comscore tracker, also branded as Scorecardresearch), TikTok Inc. (as to the TikTok analytics tracker), Google LLC (as to the Google advertising tags), Permutive Technologies, Inc. (as to the Permutive tracker), and Parse.ly, Inc., a company of Automattic Inc. (as to the Parse.ly tracker) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load. Defendant's own account identifiers are carried on the Trackers' transmissions. The Trackers are not resources users request and are not necessary to render the Website's content or functionality.

13. Defendant configured the Website so that the contents of each user's communication with the Website were transmitted twice. When a user's browser requested a page, code that Defendant embedded on the Website obtained the contents of that communication from the state of the browser for the page then being loaded, wrote those values into named parameters of a separate request, and directed the browser to send that request to servers the Third Parties control. That second transmission

delivered nothing to the user. No user action was required and none of it was visible.

14. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

16. Plaintiff CHRISTOPHER RHINESMITH is a California citizen residing in San Bernardino County, California, and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited to on April 28, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17. Defendant VOX MEDIA GROUP, LLC is a Delaware limited liability company that owns, operates, and controls the Website, an online news, opinion, and cultural-commentary platform through which Defendant publishes daily news, political analysis, identity and culture journalism, technology and policy reporting, opinion essays, and explanatory editorial coverage of current events and public policy.

18. The Website and the business that operates it were previously owned and operated by Vox Media, LLC, a Delaware limited liability company. In or about July 2026, Defendant acquired the Website and that business, and Defendant has owned, operated, and controlled the Website since that time. Defendant is sued individually as to its own conduct and as successor in interest to Vox Media, LLC as to conduct occurring before the acquisition. The Website was configured in the manner alleged

herein both before and after the acquisition, the same tracking technologies remained embedded on the Website across that transition, and the business, editorial operations, personnel, brand, and reader-facing property continued without interruption.

19. The business that owns and operates the Website maintains editorial and commercial offices in California, including in Los Angeles, California. Through the Website and related digital platforms, Defendant conducts media and publishing business nationwide and serves readers in California and throughout the United States.

## IV. JURISDICTION AND VENUE

20. Defendant is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of jurisdiction on any basis not inconsistent with the United States or California Constitutions.

21. Vox Media has cultivated California as a significant market for its editorial content and digital audience. The Website serves as a primary digital channel through which Vox Media distributes its news articles, political analysis, identity and culture journalism, and explanatory editorial coverage to California readers. Vox Media maintains and operates editorial and commercial offices in California, including in Los Angeles, California.

22. In furtherance of those operations, Vox Media entered into and maintained commercial partnerships with California-headquartered data and advertising companies, including TikTok Inc., whose United States operations are headquartered in Culver City, California, and Parse.ly, Inc., a company of Automattic Inc., which is headquartered in San Francisco, California.

23. Through those partnerships, Vox Media embedded third-party tracking technologies into the Website that transmit California users' communications to data infrastructure and servers operated by California-headquartered companies. Plaintiff, a California resident, accessed the Website from California; the tortious interception of his communications occurred on his device in California; and the intercepted data flowed

to servers operated by companies that operate from California. Plaintiff's claims arise directly from Vox Media's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications.

24. Defendant deliberately reached out beyond its state of organization by knowingly installing the Trackers onto unsuspecting California users' devices so that it could later use and monetize the data it obtained from those Trackers, in a manner that was neither random, isolated, nor fortuitous.

25. The Website's own Privacy Policy, as published to visitors when Plaintiff used the Website, confirms the conduct alleged herein. It expressly states that the operator of the Website and its third-party service providers automatically collect from each visitor's device or web browser, among other categories of information, the Web page the visitor came from, the URL the visitor goes to next, the Web page(s) that the visitor accesses during the visit, and the visitor's interaction with content on the Services. These page-URL and content-interaction fields constitute the substance of the visitor's electronic communications with the Website, and are the same categories of content-level browsing data that the Trackers intercepted from Plaintiff.

26. Defendant's purposeful direction of its tracking infrastructure at California, its commercial partnerships with California-headquartered Trackers, its operation of California-based offices, and the admissions in the Website's own Privacy Policy collectively establish that Defendant has purposefully availed itself of the privilege of conducting activities in California and has purposefully directed its conduct at California residents.

27. Plaintiff's claims arise out of and relate to Vox Media's forum-related conduct. Plaintiff's communications were intercepted on his device in California, while Plaintiff was located in California, by Trackers Vox Media deliberately embedded on its Website. The interception occurred while Plaintiff was reading content on the Website that Vox Media targeted to California audiences, and the intercepted data was routed to

infrastructure operated by companies that conduct their United States operations from California.

28. Exercising specific personal jurisdiction over Vox Media in this District comports with constitutional notions of fair play and substantial justice. Vox Media is an established media company with offices in California and substantial commercial operations directed at California residents, and Vox Media cannot reasonably claim surprise or undue burden from being haled into a California federal court to answer claims arising from interception of California residents' communications via Trackers Vox Media itself embedded on its Website.

29. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

30. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

31. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendant's state of citizenship, satisfying CAFA's minimal-diversity requirement.

32. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from his San Bernardino County residence; (3) Plaintiff resides in this District; and (4)

Defendant derives substantial revenue from California consumers in this District.

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

33. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

34. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

35. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein, which implicate traditional interests in personal privacy, constitute concrete injuries sufficient to establish Article III standing.

36. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

### 2. The Federal Wiretap Act

37. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy

Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

38. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

39. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

40. During his use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://www.vox.com/search?q=lgbtq;
- https://www.vox.com/lgbtq;
- https://www.vox.com/identities/2018/1/22/16905658/trump-lgbtq-anniversary; and
- https://www.vox.com/politics/484391/supreme-court-chiles-salazar-conversion-therapy.

41. During each of the visits identified above, the Trackers described below operated on the Website. Each Tracker received the contents of Plaintiff's communications with the Website in named parameters of its own outbound requests. The captures reproduced below illustrate what occurs during live browser access to those pages.

**1. The Comscore Tracker**

42. Defendant embedded and configured on the Website a tracking tag operated by Comscore, Inc., which brands the tag Scorecardresearch. The tag carries Defendant's own Comscore publisher account identifier on every transmission. The tag is not a resource Plaintiff requested, and it is not necessary to render any part of the Website's content or functionality. Comscore, Inc. is a registered California data broker.

43. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed Comscore's code. That code obtained the address of the page then being loaded, the title of that page, and the address of the page from which Plaintiff had navigated, wrote those values into the named parameters c7, c8 and c9 of a new request, and directed Plaintiff's browser to send that request to sb.scorecardresearch.com. The browser issued that request as an image fetch to a different site, with the contents of Plaintiff's communication carried in the address.

44. Comscore publishes documentation for publishers identifying what the tag collects. Comscore identifies c7 as the full page URL, c8 as the page title and c9 as the referring URL, and describes the parameters as the means by which Comscore measures and categorizes the publisher's website traffic. What are the parameters in the comScore Direct website tag, Comscore Direct, https://direct-support.comscore.com/hc/en-us/articles/360001863294-What-are-the-parameters-in-the-comScore-Direct-website-tag.

45. Comscore instructs publishers to confirm that the tag is working by locating the outbound tag call in a network inspection tool and examining the parameters it

carries. Defendant, which placed and configured the tag, therefore knew what the tag transmits and how to see it. How can I validate my tag is working as intended, Comscore Direct, https://direct-support.comscore.com/hc/en-us/articles/360002578333-How-can-I-validate-my-tag-is-working-as-intended.

46. The values Comscore received in those parameters, from Plaintiff's own session, included the page addresses identified above; the page titles "LGBTQ | Vox," "Trump's first year was awful for LGBTQ rights | Vox" and "Why the Supreme Court ruled in favor of anti-LGBTQ+ "conversion therapy" | Vox"; and, as the referring address on the article pages, https://www.vox.com/search?q=lgbtq and https://www.vox.com/lgbtq. Comscore's persistent UID and XID identifiers were transmitted in the Cookie header of the same requests.

47. Comscore obtained those contents at the moment Plaintiff requested each page, attributed them to a persistent identifier that had been assigned to Plaintiff's browser before that session began, and used them to measure and categorize the traffic on which it sells measurement services. Categorizing a page and attributing traffic to it are operations performed on the transmitted address and title as they are received.

48. Figure 1 is a network capture of an outbound request transmitted to Comscore at sb.scorecardresearch.com during the load of vox.com/search?q=lgbtq. The page address and Defendant's publisher account identifier are carried in named parameters, the Referer header identifies the source page, and Comscore's XID identifier is carried in the Cookie header of the same request.

/ / /

/ / /

/ / /

**Figure 1**



49. Figure 2 is a network capture of an outbound request transmitted to Comscore at sb.scorecardresearch.com during the load of the January 2018 article identified above. The full article address is carried in c7, the article title in c8, and Comscore's XID identifier in the Cookie header of the same request.

**Figure 2**



50. Figure 3 is a network capture of an outbound request transmitted to Comscore at sb.scorecardresearch.com during the load of the conversion-therapy article identified above. The full article address is carried in c7, the article title in c8, and Comscore's XID identifier in the Cookie header of the same request.

**Figure 3**




51. Comscore, Inc. is not a party to the communications between Plaintiff and the Website. It operates an audience measurement and behavioral data business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the tag on the Website.

### 2. The TikTok Tracker

52. Defendant embedded and configured on the Website an analytics tracking pixel operated by TikTok Inc. The pixel carries Defendant's own TikTok pixel identifier on every transmission. It is not a resource Plaintiff requested and is not necessary to render the Website's content.

53. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed TikTok's code. That code obtained the address of the page then being loaded, the address of the page from which Plaintiff had navigated, and the Website's own title and description for that page, wrote those values into named fields of a new request body, and directed Plaintiff's browser to post that request to analytics.tiktok.com.

54. The values TikTok received in the url field, from Plaintiff's own session,

included https://www.vox.com/search?q=lgbtq, so the term Plaintiff had entered in the Website's search function was itself transmitted to TikTok in a named field. On the article pages the referrer field carried https://www.vox.com/search?q=lgbtq and https://www.vox.com/lgbtq. TikTok's persistent anonymous_id identifier was transmitted in the same request body.

55. TikTok obtained those contents at the moment Plaintiff requested each page and attributed them to a persistent identifier assigned to Plaintiff's browser. TikTok publishes documentation describing the pixel as the means by which a publisher shares information about the actions visitors take on its website for use in TikTok's advertising products. About TikTok Pixel, TikTok Ads Manager, https://ads.tiktok.com/help/article/tiktok-pixel.

56. Figure 4 is a network capture of an outbound POST request transmitted to TikTok at analytics.tiktok.com during the load of vox.com/lgbtq. The request body carries the persistent anonymous_id identifier together with the page address, title and description.

**Figure 4**



57. Figure 5 is a network capture of an outbound POST request transmitted to TikTok at analytics.tiktok.com during the load of the January 2018 article identified above. The request body carries the persistent anonymous_id identifier together with the

full article address, title and description.

**Figure 5**




58. TikTok Inc. is not a party to the communications between Plaintiff and the Website. It operates an advertising and audience data business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the pixel on the Website.

### 3. The Google Tracker

59. Defendant embedded and configured on the Website advertising tags operated by Google LLC, which transmit to servers at www.google.com, googleads.g.doubleclick.net and securepubads.g.doubleclick.net. The tags carry Defendant's own Google account and ad unit identifiers on every transmission, and are not necessary to render the Website's content.

60. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed Google's code. That code obtained the address of the page then being loaded and the title of that page, wrote those values into the named parameters url, dl, tiba and dt of new requests, and directed Plaintiff's browser to send those requests to the Google endpoints identified above. Google's persistent IDE identifier was transmitted in the Cookie header of the same requests.

61. Google publishes documentation for publishers stating that ad requests to Google serve personalized ads by default, and that the selection of the advertisement is based on both the content of the web page and the history of the individual user visiting that page. Ads personalization settings in Google's publisher ad tags, Google Ad Manager Help, https://support.google.com/admanager/answer/7678538. Selecting an advertisement on the basis of the content of the page cannot be done without ascertaining what the transmitted address and title say, and Google performs that selection in response to the request that carries them.

62. Google gives publishers a parameter that suppresses that behavior. Google documents that a publisher may mark an ad request as non-personalized by adding the npa parameter to the request, that omission of the parameter defaults to personalized ads, and that the parameter is stateless, so that where it is not set on a later request the behavior reverts to personalized ads. Ads personalization settings in Google's publisher ad tags, Google Ad Manager Help, https://support.google.com/admanager/answer/7678538. None of the transmissions from Plaintiff's session suppressed personalization; the requests carried npa=0.

63. Google instructs publishers to confirm the setting by locating the ad request in the browser's developer tools and examining the npa parameter. Defendant, which placed and configured the tags, therefore knew what the tags transmit, knew that personalization was the default, and knew how to see and change it. Ads personalization settings in Google's publisher ad tags, Google Ad Manager Help, https://support.google.com/admanager/answer/7678538.

64. Google LLC is not a party to the communications between Plaintiff and the Website. It operates an advertising and audience data business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the tags on the Website.

**4. The Permutive Tracker**

65. Defendant embedded and configured on the Website tracking code operated

by Permutive Technologies, Inc. The code carries Defendant's own Permutive workspace identifier on every transmission, and is not necessary to render the Website's content.

66. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed Permutive's code. That code obtained the address of the page then being loaded, the address of the page from which Plaintiff had navigated, and the Website's own title, description and keyword labels for that page, wrote those values into named fields of a new request body, and directed Plaintiff's browser to post that request to api.permutive.com.

67. Permutive publishes documentation stating that its web software development kit is required in order to collect events and to enable real-time evaluation of the cohorts a user belongs to. Curation, Permutive, https://docs.permutive.com/products/curation.

68. Permutive publishes documentation stating that its software development kit automatically allocates a unique identifier to a user on a device, and that the identifier is used in Permutive's cloud to generate audience insights and on the device to hold cohort information across sessions. Identity, Permutive, https://docs.permutive.com/concepts/identity. That identifier was transmitted to Permutive together with the contents of Plaintiff's communications, and Defendant stored it on the Website's own domain.

69. Permutive Technologies, Inc. is not a party to the communications between Plaintiff and the Website. Permutive publishes documentation stating that it aggregates publisher audience signals into standardized audiences and packages that it makes available to advertisers under its own brand through third-party marketplaces, that it handles the demand generation, packaging, deal creation and buyer reporting for those products, and that it charges a fee for doing so. Curation, Permutive, https://docs.permutive.com/products/curation. It therefore has the capability to use its

record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the code on the Website.

**5. The Parse.ly Tracker**

70. Defendant embedded and configured on the Website tracking code operated by Parse.ly, Inc., a company of Automattic Inc. The code carries Defendant's own Parse.ly site identifier on every transmission, and is not necessary to render the Website's content.

71. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed Parse.ly's code. That code obtained the address of the page then being loaded, the address of the page from which Plaintiff had navigated, and the title of that page, wrote those values into the named parameters url, urlref and title of a new request, and directed Plaintiff's browser to send that request to p1.parsely.com.

72. The values Parse.ly received in those parameters, from Plaintiff's own session, included https://www.vox.com/search?q=lgbtq in the url parameter on the search results page and again in the urlref parameter on the article pages, together with the full article addresses and the article titles. A persistent visitor identifier was transmitted in the same request.

73. The same request carried, in its own named parameters, a count of the separate browsing sessions associated with that identifier and the time of the immediately preceding session. On Plaintiff's April 28, 2026, visit those parameters identified the visit as the seventh session associated with his identifier and recorded a prior session three days earlier. The transmissions therefore show on their face that the identifier accompanying the contents of Plaintiff's communications had persisted across separate sessions on separate days.

74. Parse.ly, Inc. is not a party to the communications between Plaintiff and the Website. It operates a content analytics business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that

interception by embedding and configuring the code on the Website.

**6. Interception While in Transit**

75. Two sets of code ran as part of Plaintiff's browser's single attempt to load each page identified above. The first was the Website's own code, which delivered the page Plaintiff had asked for. The second was the Trackers' code, which delivered nothing to Plaintiff at all.

76. The Trackers did not obtain the contents of Plaintiff's communications from Defendant's stored records, and there was no separate transaction in which Defendant later furnished them. There was no interval in which the values sat at rest in Defendant's possession before the Trackers acquired them. The values the Trackers transmitted were read from the state of the browser for the page then being loaded, and they identified that page and no other.

77. Each of those transmissions was therefore initiated by the Trackers' own code and was concurrent with Plaintiff's communications with the Website, and the contents of those communications were acquired while in transit, while passing over a wire, line or cable, and while being sent from and received at Plaintiff's device in California.

78. No action by Plaintiff was required to trigger any of these transmissions and none of them was visible to him. Plaintiff had no opportunity to see, review, prevent or object to any of them before they occurred.

79. Defendant knew of this arrangement and constructed it. Defendant's own account identifiers ride on every one of the transmissions described above, and Defendant's own first-party code and tag management cause each of the Trackers to load.

## VII. CLASS ALLEGATIONS

80. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

All persons within California whose electronic communications with

the Website, including the URL contents of their HTTP requests to the Website were intercepted by one or more Trackers between April 28, 2025 and the present.

81. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

82. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

83. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

84. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

85. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against All Defendants

86. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

87. Plaintiff brings this cause of action on behalf of himself and the Class.

88. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

89. The page addresses, the page titles, and the referring addresses identifying the pages from which Plaintiff and Class members navigated and the terms they entered in the Website's search function, all transmitted to the Trackers in named payload parameters, constitute the "contents" of those communications within the meaning of §

631(a). As described in the preceding tracker-specific allegations, Defendant caused each such communication to be duplicated and sent in parallel to the Trackers at sb.scorecardresearch.com, analytics.tiktok.com, www.google.com and googleads.g.doubleclick.net, api.permutive.com, and p1.parsely.com, and each Tracker acquired those contents while the same communication was in transit between Plaintiff's browser and Defendant's servers.

90. Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

91. Section 631(a) reaches not only reading the contents of a communication but learning its contents or meaning. Selecting an advertisement on the basis of the content of the page, and determining from a page-view event which audiences the person who generated it belongs to, are operations performed on the transmitted values in response to the request that carries them, and neither can be performed without ascertaining what those values say.

92. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX. SECOND CAUSE OF ACTION

**Violations of 18 U.S.C. § 2511(1)(a)**

**By Plaintiff and the Class Members Against All Defendants**

93. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94. Plaintiff brings this cause of action on behalf of himself and the Class.

95. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

96. The page addresses, the page titles and the referring addresses transmitted to the Trackers in named payload parameters are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8), because they communicate the substance, purport and meaning of what Plaintiff and Class members were reading and searching for. As described in the preceding tracker-specific allegations, Defendant caused those contents to be duplicated and sent in parallel to the Trackers at the endpoints identified above, and each Tracker acquired them while the same communication was in transit.

97. Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

98. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X. THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against All Defendants

99. Plaintiff re-alleges and incorporates by reference all preceding paragraphs

as if fully set forth herein.

100. Plaintiff brings this cause of action on behalf of himself and the Class.

101. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

102. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

103. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

104. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

105. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to

and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

106. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI. FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against All Defendants

107. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108. Plaintiff brings this cause of action on behalf of himself and the Class.

109. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

110. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

111. Plaintiff and Class Members had a reasonable expectation of privacy in the

contents of their electronic communications with the Website. A reasonable person visiting an online news and commentary website providing news, political analysis, identity and culture journalism, and explanatory editorial coverage does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

112. Defendant's conduct constitutes a serious invasion of that privacy. By embedding and configuring five third-party tracking technologies on the Website, Defendant caused the covert transmission to those third parties, in real time and in named parameters of their own requests, of the addresses and titles identifying the specific subject matter Plaintiff and Class Members were reading and the terms they entered in the Website's search function, each attributed to a persistent identifier. Measured against community norms rather than against any characteristic particular to Plaintiff, that conduct constitutes an egregious breach of social norms.

113. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII. <u>FIFTH CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against All Defendants

114. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

115. Plaintiff brings this cause of action on behalf of himself and the Class.

116. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in

which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

117. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding five third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

118. The intrusion is highly offensive to a reasonable person. The pages identified above are descriptive on their face, and the addresses and titles transmitted identify the specific subject matter each visitor was reading and the terms each visitor entered in the Website's search function. Defendant covertly caused that information to be transmitted to five separate commercial entities, each of which attributed it to a persistent identifier assigned to the visitor's browser, for use in advertising and audience data products. A reasonable person would find the covert transmission of the specific subject matter of his or her reading to multiple commercial entities, without notice and without any means of preventing it, highly offensive. The offensiveness is measured objectively and does not depend on any characteristic particular to Plaintiff.

119. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against All Defendants

120. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

121. Plaintiff brings this cause of action on behalf of himself and the Class.

122. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

123. Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

124. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

125. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

126. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense. Plaintiff pleads this claim in the alternative. Plaintiff lacks an adequate remedy at law as to the relief sought here, because the statutory damages available under Cal. Penal Code

§ 637.2 and 18 U.S.C. § 2520 are fixed sums that do not reach and are not measured by the profits Defendant derived from the ongoing commercial exploitation of Class Members' intercepted browsing data, and because restitution and disgorgement of those profits are measured by Defendant's gain rather than by Plaintiff's loss.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: August 14, 2026 **LAW OFFICES OF ROSS CORNELL, APC**

By: *<u>/s/ Ross C. Cornell</u>*

Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*